No. 11-3716

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

RONALD A. SEIVER,
Defendant-Appellant.

Appeal From the United States District Court
For the Central District of Illinois, Rock Island Division
Case No. 10 CR 40091
The Honorable Judge James E. Shadid

**BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT RONALD A. SEIVER**

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
401 Main Street, Suite 1500
Peoria, Illinois  61602
Telephone:  (309) 671-7891
Fax:          (309) 671-7898

JONATHAN E. HAWLEY
Federal Public Defender

GEORGE F. TASEFF
Senior Litigator

ANDREW J. MCGOWAN
Staff Attorney

Attorneys for Defendant-Appellant,
RONALD A. SEIVER

**ORAL ARGUMENT REQUESTED**

## DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following list in compliance with Federal Rule of Appellate Procedure 26.1:

1.  The full name of every party or amicus the attorney represents in the case:  RONALD A. SEIVER.

2.  Said party is not a corporation.

3.  The names of all law firms whose partners or associates have appeared for a party in the district court or are expected to appear for the party in the case: Jonathan E. Hawley, George F. Taseff and Andrew J. McGowan, of the Federal Public Defender's Office for the Central District of Illinois.

/s Andrew J. McGowan

ANDREW J. MCGOWAN
Staff Attorney

Dated:  March 21, 2012

# TABLE OF CONTENTS

**PAGE**

DISCLOSURE STATEMENT............................................... ii

TABLE OF AUTHORITIES............................................... v
      CASES......................................................... v
      STATUTES.................................................... vi
      OTHER AUTHORITIES...................................... vii

JURISDICTIONAL STATEMENT......................................... 1

ISSUE PRESENTED FOR REVIEW...................................... 2

      Did the District Court err when it denied Mr. Seiver's motion to
      suppress evidence where the information in the affidavit was
      insufficient to establish probable cause?............................. 2

STATEMENT OF THE CASE............................................ 3

STATEMENT OF FACTS................................................ 5

      A.    Motion to Suppress............................................ 5

      B.    District Court Denies Motion to Suppress Evidence.............. 14

      C.    Conditional Plea.............................................. 15

      D.    Sentencing .................................................. 15

SUMMARY OF ARGUMENT........................................... 16

ARGUMENT......................................................... 18

      The District Court erred when it denied Mr. Seiver's motion to
      suppress evidence where the information in the affidavit was
      insufficient to establish probable cause............................ 18

      A.    Standard of Review...................................... 18

B.      Legal Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.      Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.      Insufficient Evidence to Establish Probable Cause. . . . 20

                a.      Information Over Seven Months Old Stale. . . . . 21

                b.      Boilerplate Language Should Not Help
                        Establish Probable Cause. . . . . . . . . . . . . . . . . . . . 25

        2.      Good Faith Exception Should not Apply. . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C). . . . . . . . . 38

## TABLE OF AUTHORITIES

**PAGE**

### CASES

*Illinois v. Gates*, 462 U.S. 213 (1983)................................ 16, 18, 19, 20

*Ornelas v. United States*, 517 U.S. 690 (1996).................................. 18

*Owens v. United States*, 387 F.3d 607 (7th Cir. 2004)........................... 33

*Sgro v. United States*, 287 U.S. 206 (1932)............................... 19, 20

*United States v. Aljabari*, 626 F.3d 940 (7th Cir.2010).......................... 18

*United States v. Bell*, 585 F.3d 1045 (7th Cir. 2009)............................ 18

*United States v. Berkos*, 543 F.3d 392 (7th Cir.2008)............................ 18

*United States v. Clark*, ___ F.3d ___, 2012 WL 470264 (7th Cir., Feb. 13, 2012)... 25, ..................................................... 26, 27, 28, 29

*United States v. Dobbs*, 629 F.3d 1199 (10th Cir. 2011).......................... 27

*United States v. Garcia*, 528 F.3d 481 (7th Cir. 2008)....................... 18, 32

*United States v. Harris*, 403 U.S. 573 (1971)................................... 19

*United States v. Haymond*, 2012 U.S. App. LEXIS 4652 (10th Cir. March 6, 2012).. 24

*United States v. Henson*, 848 F.2d 1374 (6th Cir. 1988)......................... 19

*United States v. Hython*, 443 F.3d 480 (6th Cir. 2006)......................... 33

*United States v. Koelling*, 992 F.2d 817 (8th Cir. 1993)......................... 19

*United States v. Leon*, 468 U.S. 897 (1984)................................... 32

*United States v. McIntire*, 516 F.3d 576 (7th Cir.2008)......................... 18

*United States v. Moreland*, 665 F.3d 137 (5th Cir. 2011)........................ 24

*United States v. Newsom*, 402 F.3d 780 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 22, 25

*United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Pappas*, 592 F.3d 799 (7th Cir.2010) . . . . . . . . . . 26, 30, 31, 33, 34, 35

*United States v. Prideaux-Wentz*, 543 F.3d 954 (7th Cir. 2008) . . 21, 22, 25, 26, 33, 34

*United States v. Singer*, 943 F.2d 758 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 23, 25

*United States v. Spikes*, 158 F.3d 913 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Tehfe*, 722 F.2d 1114 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Watts*, 535 F.3d 650 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Watzman*, 486 F.3d 1004 (7th Cir.2007) . . . . . . . . . . . . . . . . . . . . 18

*United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Weber*, 923 F.2d 1338 (9th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Whited*, 539 F.3d 693 (7th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Zimmerman*, 277 F.3d 426 (3d Cir.2002) . . . . . . . . . . . . . . . . . . . . 33

*Wong Sun v. United States*, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTES

18 U.S.C. § 2251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 2251(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 2252A(a)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 2252A(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 2256. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

None.

# JURISDICTIONAL STATEMENT

1.     The jurisdiction of the United States District Court for the Central

District of Illinois, was founded upon 18 U.S.C. § 3231.  A grand jury sitting in the

aforementioned district charged the Defendant, Ronald Alan Seiver,  by

indictment with the offense of possession of child pornography in violation of

Title 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (Count One); sexual exploitation of a

child in violation of Title 18 U.S.C. §§ 2251(a) and (e) (Count Two);  and forfeiture

allegations pursuant to Title 18 U.S.C. § 2253.

2.     The jurisdiction of the United States Court of Appeals for the

Seventh Circuit is founded upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and is

based upon the following particulars:

i.     Date of entry sought to be reviewed:  judgment and conviction

entered December 1, 2011;

ii.     Filing date of motion for a new trial:  N/A

iii.     Disposition of motion and date of entry:  N/A

iv.     Filing date of notice of appeal: December 5, 2011.

## ISSUE PRESENTED FOR REVIEW

Did the District Court err when it denied Mr. Seiver's motion to suppress evidence where the information in the affidavit was insufficient to establish probable cause?

## STATEMENT OF THE CASE[1]

This is a direct appeal in a criminal case.[2]

On September 15, 2010, a grand jury sitting in the Central District of Illinois charged the defendant, Ronald Alan Seiver, by indictment with the offenses of of possession of child pornography in violation of Title 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (Count One); sexual exploitation of a child in violation of Title 18 U.S.C. §§ 2251(a) and (e) (Count Two); and forfeiture allegations pursuant to Title 18 U.S.C. § 2253.  (R. #12, 09/15/10)(App. 2-4).

On December 10, 2010, defense counsel filed a motion to suppress evidence. (R. #21, 12/10/10). On April 8, 2011, Government counsel filed a response to the motion to suppress. (R. # 23, 04/08/11).

On April 12, 2011, following an evidentiary hearing, the District Court denied Mr. Seiver's motion to suppress evidence. (R. 04/12/11. On April 14, 2011, the District Court entered a written order denying Mr. Seiver's motion to suppress evidence. (R. #26, 04/14/11)(App. 11-18).

On May 13, 2011, Mr. Seiver pleaded guilty to the indictment pursuant to a written reservation specifically reserving his right to appeal the District Court's

---

[1]Materials in the Appendix will be referenced "App."; references to the transcript of the hearing on the motion to suppress will be "MT"; references to the sentencing hearing will be "SENT."; references to the presentence report will be "PSR"; references to the minutes will be "Min."; and references to the record will be "R".

order and judgment of April 14, 2011, denying his motion to suppress evidence. (R. 05/13/11; #27; App. 11-18).

On November 30, 2011, the District Court sentenced Mr. Seiver to a term of imprisonment of one hundred twenty months on Count 1, and a term of imprisonment of three hundred months on Count 2, said terms to run consecutively, and lifetime period of supervised release. (R. 11/30/11)(App. 5-6). The District Court entered its written judgment on December 1, 2011. (R. #40, 12/01/11; App. 3).

On December 5, 2011, Mr. Seiver's counsel filed a timely notice of appeal. (R. #46, 12/05/11; App. 1).

## STATEMENT OF FACTS

### A.     Motion to Suppress

On August 16, 2010, Special Agent Dwayne Haferkamp of the United

States Immigration and Customs Enforcement, Department of Homeland

Security, appeared before United States Magistrate Judge Thomas J. Shields and

presented to the Court an Application For Search Warrant to search the premises

located at 1042 U.S. Highway 67, Roseville, Illinois, for evidence of child

pornography. (App. 22-44). A copy of Agent Haferkamp's application for search

warrant is reproduced in the appendix to this brief.  (*Id.*)

According to Agent Haferkamp's application for search warrant, on

January 7, 2010, an individual utilizing the screen name/user name "David

Smith" sent a link via facebook.com to "D.W.," who was the step-mother of

"J.H.," her 13-year old stepdaughter, that contained sixteen visual images of

"J.H.," two of which constituted child pornography. (TR, 9; App. 29, ¶ 9). The

images were posted on a link to the yfrog.com website and was accompanied

with the following text message: "is [J.H.] ur daughter? U need 2 tell dat slut 2

stop getting naked on cam on blogtv n on msn 4 ppl. she also say she had sex

over 100 times since she was 9 yrs old."[3] (*Id.*).

On January 8, 2010, "D.W." reported the incident to the London Police

---

[3]The original message contained the actual names of "D.W." and "J.H.", which
counsel has replaced here with both the women's initials.

Services (LPS) in Ontario, Canada, where "D.W." and her stepdaughter, "J.H.," resided, and LPS commenced an investigation. (App. 29 ¶ 10).

On January 11, 2010, Detective Constable Jeremy Dann, a member of the cyber crimes unit for the LPS, accessed the yfrog.com website that contained the photographs of "J.H." and noted that the photographs appeared to be still images from an audio video interleave (avi) file that was 10 minutes, 13 seconds in duration, and bore the filename "cassyslut.avi." (App. 31 ¶ 13). DC Dann conducted a query of the yfrog.com account and found it to be a sub-site of "Imageshack," a popular internet site that provides file and image sharing services. DC Dann concluded that the images of child pornography that were transmitted to "D.W." via facebook.com had been uploaded to yfrog.com on January 7, 2010, (local date and time) from Internet Protocol address (IP address) 74.36.163.43. (App. 31-32 ¶¶ 13, 15).

DC Dann further determined that the IP address 74.36.163.43 was assigned to the Internet Service Provider (ISP) Frontier Communications, which was located in Rochester, New York. (App. 31 ¶ 15). An investigative referral was subsequently made to the U.S. Immigration and Customs Enforcement (ICE) office in Buffalo, New York. (App. 32-33 ¶ 18).

On April 28, 2010, Frontier Communications, in response to a subpoena, advised that at the time the images were uploaded to the yfrog.com site on January 7, 2010, from IP address 74.36.163.43, the subscriber assigned to that IP

address was an individual by the name of "Ron Seiver," located at 1042 US Highway 67, Roseville, Illinois 61473, in Warren County, in the Central District of Illinois. (App. 33, 37 ¶¶ 20, 21).

Based on this information, a collateral referral was sent to the ICE office in Springfield, Illinois, and the case was assigned to Special Agent Dwayne Haferkamp. (App. 33 ¶ 20).

During his investigation of this matter, SA Haferkamp reviewed the images posted on the yfrog.com site from IP address 74.36.163.43, and concluded, based on his training and experience, that two of the images depicted child pornography as defined in 18 U.S.C. § 2256. (App. 33 ¶ 20; MT 9).

On April 28, 2010, SA Haferkamp conducted a check in CLEAR for 1042 US Highway 67, Roseville, Illinois 61473. CLEAR consolidates public records including addresses, driver's licenses, property deed transfers and corporate information. According to the CLEAR check, associated with this address were Ronald Seiver (the defendant), Brian Addis, April Addis, Jeanne G. Alexander, and Douglas E. Alexander. (App. 37 ¶ 22).

On August 16, 2010, SA Haferkamp appeared before United States Magistrate Judge Thomas J. Shields and presented an Application for Search Warrant to search the premises located at 1042 U.S. Highway 67, Roseville, Illinois, for evidence of child pornography. In support of this Application, SA Haferkamp presented an Affidavit which included the investigative information

outlined above, as well as more detailed information about the images posted on the yfrog.com site. (App. 21-44). Prior to submitting his application for search warrant to Magistrate Judge Shields, SA Haferkamp's affidavit was reviewed and approved by his supervisor and Assistant United States Attorney Michael McCoy. (MT 16).

In paragraph 20 of his affidavit (App. 33-36, ¶ 20), SA Haferkamp specifically described the images uploaded to the yfrog.com site from the IP address located at 1042 US Highway 67, Roseville, Illinois. Of the 16 still images that had been uploaded from the original audio visual file, SA Haferkamp identified and described in his affidavit the following two images as being images of child pornography, because they showed the lascivious exhibition of the genitals of the 13-year old female (MT 9):

> Image twelve is taken from an avi file at the 432nd second and is described as follows: J.H. is sitting in the green striped chair leaning back with her bottoms pulled off. J.H. has her legs open with her right hand placed over her vaginal area with her fingers touching her vagina. The image shows the lewd display of the breasts and genital area of a child less than 18 years of age.

> Image fourteen is taken from an avi file at the 505th second and is described as follows: J.H. is sitting in the green striped chair leaning back with a pink spaghetti strap shirt on with her bottoms pulled off. J.H. has her legs open with her right hand placed over her vaginal area with her fingers touching or near her vagina. J.H.'s left hand is touching her chin and mouth. The image shows the lewd display of the genital area of a child less than 18 years of age.

(App. 33-36 ¶ 20A, subsections xii, xiv).

SA Haferkamp went on to identify in paragraph 27 of the Affidavit certain characteristics common to individuals involved in the receipt and collection of child pornography. (App. 38-40). Chief among which is the tendency for those in possession of child pornography to maintain their pictures, films, photographs, and videotapes for "many years." (App. 39 ¶ 27(C)). In paragraph 27 of the Affidavit, SA Haferkamp noted that "collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area ...[and] are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly." ((App. 39 ¶ 27(D)).

Based on the information contained in the Application for Search Warrant, Magistrate Judge Shields issued a Search Warrant on August 16, 2010, to search the premises located at 1042 U.S. Highway 67, Roseville, Illinois. (App. 19).

On August 24, 2010, at approximately 9:30 a.m., SA Haferkamp, ICE Special Agent Michael Mitchell, Investigator Tom Berola of the Illinois Attorney General's Office, as well as five other law enforcement agents, gathered in the general vicinity of 1042 U.S. Highway 67 and prepared to execute the search warrant. (TR 19-20). Most of the agents were dressed in 511 tactical pants or jeans, and were wearing bulletproof vests. None of the agents were wearing helmets. The agents were armed as part of their normal course of duty. (MT 20,

129-130).

As the agents approached the house located at 1042 U.S. Highway 67 to execute the search warrant, they encountered Mr. Seiver's step-father in the front yard. (MT 26-27). After entering the home, agents found Mr. Seiver's mother and sister on the first floor. (MT 30-31). Agents then proceeded up to the second floor of the residence where they located Mr. Seiver in his bedroom. (MT 32-33).

SA Mitchell was the first to enter the bedroom. Upon entry, SA Mitchell observed Mr. Seiver on his bed with a laptop computer in close proximity. (MT 131). SA Mitchell observed Mr. Seiver typing something on the computer with one hand while slipping something under the mattress of the bed with the other hand. (MT 131). As SA Mitchell approached Mr. Seiver, he also noticed that there was some type of program running on the laptop. Concerned that Mr. Seiver may have been trying to delete files, SA Mitchell immediately pulled the battery out of the laptop to shut the program down. Mr. Seiver was quickly removed from the bedroom, handcuffed, and taken out of the house while agents continued securing the residence. (MT 131-133).

The other three occupants of the residence were escorted out of the house and seated in a patio area while agents finished securing the residence. (MT 31). Inside Mr. Seiver's bedroom, agents located an Acer Aspire Model 5720 laptop computer on the bed, and a Sandisk 16 gigabyte thumb drive which was found under the mattress of the bed directly underneath where Mr. Seiver was located

when SA Mitchell observed him slipping something under the mattress. (MT 33-34, 135).

After the residence was secured, searched, and photographed, the laptop computer and thumb drive were removed from Mr. Seiver's bedroom and brought down to the first floor dining room area of the house so that a forensic preview search of the files contained on these devices could be conducted by Task Force Officer Ellen Price. (MT, 41-43, 136). Using a forensic software program on her computer, TFO Price conducted a preliminary scan of the image and video files contained in both of these devices for suspected child pornography. (MT 42-43, 136).

Shortly after TFO Price had begun her forensic preview of the laptop computer and thumb drive, and just prior to beginning his interview of Mr. Seiver, Inv. Berola approached TFO Price, who was still in the middle of her preview, to see if she had discovered any images of child pornography on either of the devices. (MT, 158-159). TFO Price showed Inv. Berola various images of suspected child pornography that she had already found on the thumb drive as well as pictures of Mr. Seiver engaged in a sexual encounter with a younger-looking female. (MT, 159). At the time, investigators did not know the identity or specific age of the younger looking female in these pictures; and in fact, they did not even know that she was a minor. Possessed with this information from TFO Price's forensic scan, Inv. Berola commenced his interview

of Mr. Seiver at approximately 10:40 a.m. (MT 159-160).

By this time, Mr. Seiver had been escorted into the kitchen area of the residence for the interview. (MT 160). He was not handcuffed and was seated at the kitchen table. (MT 39-40). SA Haferkamp joined Inv. Berola for the interview. Prior to questioning Mr. Seiver, Inv. Berola explained to him that he was not under arrest and that he had no plans to arrest him. (MT 160-161). Inv. Berola then went on to advise Mr. Seiver of his Miranda rights, both verbally and in writing. (MT 161).

Inv. Berola explained to Mr. Seiver that even if he chose to waive his rights at this time, he could still exercise his rights at any time during the course of the interview. (MT 161-162). Mr. Seiver advised that he understood his rights, signed the waiver form, and stated that he would be willing to answer questions. (MT 50, 161).

Approximately fifteen minutes into the interview, SA Mitchell came into the kitchen and requested Inv. Berola to ask Mr. Seiver about "Brittany Miller" who was the younger looking female who appeared in one of the visual images on the thumb drive engaged in a sexual act with Seiver. (MT 53-54, 164-165). While the agents were interviewing Mr. Seiver, TFO Price had found a picture of "Brittany Miller's" high school identification card on Mr. Seiver's thumb drive which indicated that "Brittany Miller" was only 15-years old at the time the sexually oriented pictures had been taken. (MT 54).

12

After receiving this information from SA Mitchell, Inv. Berola asked Mr. Seiver to "tell us a little bit about Brittany Miller." (MT 164). Mr. Seiver stated that he had met M.M. online and admitted having sexual relations with Ms. Miller on two separate occasions during the fall of 2008, and that it was both of their ideas to take pictures and video of their sexual encounters. (MT 55-56). Mr. Seiver admitted to Inv. Berola and SA Haferkamp that he knew at that time that M.M. was only 16-years old. (MT 165).

Later during the interview, Mr. Seiver's mother, who was seated in a patio area outside of the house, began to complain of having chest pains, and paramedics were summoned to the household. (MT 165-166). While waiting for the paramedics to arrive, Mr. Seiver's mother was moved back inside the house so that she could lay down on a couch in the living room. (MT 57). Mr. Seiver told agents that his mother had suffered a stroke the previous year and was diagnosed with fibromyalaga. (MT 58-59, 166). At no time did Mr. Seiver ask about his mother's condition or ask to stop the interview so that he could check on her. (MT 59, 166).

Later, at the conclusion of the interview, Mr. Seiver was advised that he was being placed under arrest for possession and production of child pornography. (MT 66-67). The agents decided to arrest Mr. Seiver on site due to the admissions he had made to them about having a sexual relationship with a minor Brittany Miller, as well as the fact that he had apparently produced images

of child pornography with Brittany Miller. (MT 66-67).

**B.     District Court Denies Motion to Suppress Evidence**

On April 14, 2011, the District Court entered a written order denying Mr. Seiver's motion to suppress evidence. (R. #26, 04/14/11; App. 11-18).

In its Order, the District Court found that "[t]he warrant application in this case explained that purveyors of child pornography tend to hold onto their 'collections' for long periods of time. It is also apparent that SA Haferkamp did not base his application only on the images, but also relied on the evidentiary trail that was established confirming the link between Seiver and the IP address used to upload the images, as well as the residence in Roseville, Illinois. The Court therefore concludes that the information contained in the search warrant application was not stale and provided the requisite probable cause." (R. #26 p. 4; App. 14).

Further, the District Court ruled that "even if the information contained in the search warrant application could be deemed stale, the record would nevertheless support a finding of reasonable reliance by the officers that would also warrant the denial of this aspect of Seiver's Motion to Suppress Evidence." (R. #26, p. 5; App. 15).

Finally, the District Court concluded that "Seiver knowingly, voluntarily, and intelligently waived his Fifth Amendment rights and is not entitled to the exclusion of statements that he made during the interview following that

waiver."

(R. #26, p. 8; App. 18).

### C.    Conditional Plea

On May 13, 2011, Mr. Seiver pleaded guilty to the indictment pursuant to a written reservation specifically reserving his right to appeal the District Court's order and judgment of April 14, 2011, denying his motion to suppress evidence. (R. 05/13/11; #27).

### D.    Sentencing

On November 30, 2011, the District Court sentenced Mr. Seiver to a term of imprisonment of one hundred twenty months  on Count 1, and  a term of imprisonment of three hundred months on Count 2, said terms to run consecutively, and lifetime period of supervised release. (R. 11/30/11; App. 5-6). The District Court entered its written judgment on December 1, 2011. (R. #40, 12/01/11; App. 3).

On December 5, 2011, Mr. Seiver's counsel filed a timely notice of appeal. (R. #46, 12/05/11; App. 1).

## SUMMARY OF ARGUMENT

The district court erred by not granting Mr. Seiver's motion to suppress the physical evidence agents obtained by executing the search warrant. The application for the search warrant failed to set forth sufficient facts which would lead a neutral and detached magistrate reasonably to conclude that there was probable cause to believe that evidence of child pornography would be present at the Defendant's residence. *Illinois v. Gates*, 462 U.S. 213 (1983). Indeed, the only actual evidence in the agent's affidavit was that child pornography was traced to Defendant's IP address based on the January 7, 2010, facebook message sent by "David Smith" to "D.W." that contained a link to a yfrog.com page that included 16 digital images, only two of which were of child pornography. This email with a link was sent over seven months before Agent Haferkamp appeared before Magistrate Judge Shields on August 16, 2010, and requested issuance of the search warrant. Although four months after the email, Agent Haferkamp determined that the images came from Mr. Seibert's computer, such information is too stale and remote to establish probable cause that evidence of child pornography would be present at the Defendant's residence at the time of the issuance of the warrant. Moreover, such evidence of a single upload or the link to two images of child pornography fails to establish a continuing course of criminal conduct on which probable cause for a search warrant could be based.

The district court found that the evidence was not too stale because the court believed that the evidence established that Mr. Seiver was a collector of child pornography. However, without evidence to establish that the subject of the request for a warrant is a collector, staleness is a very significant factor in the probable cause analysis. The evidence in this case did not establish that Mr. Seiver could be considered a collector of child pornography. There was only one upload. That upload was to allow a link to be placed in the email to the step-mother, informing her of her step-daughter's pictures and advising her to stop her step-daughter from continuing. Mr. Seiver's actions were not the behavior of a collector of child pornography.

Because Agent Haferkamp's affidavit is so conclusory in its allegations and so plainly deficient in establishing probable cause to search the Defendant's residence, no reasonably trained officer would believe, in good faith, that the warrant was valid. As a result, all of the physical evidence that is the subject of this motion was seized and obtained from the Defendant's residence in violation of his rights secured under the Fourth Amendment to the United States Constitution. *Wong Sun v. United States*, 371 U.S. 471, 479-84 (1963).

# ARGUMENT

**The District Court erred when it denied Mr. Seiver's motion to suppress evidence where the information in the affidavit was insufficient to establish probable cause.**

## A.    Standard of Review

In reviewing a district court's decision to deny a motion to suppress evidence, this Court reviews its legal conclusions *de novo* and its factual findings for clear error. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir.2008); *United States v. Whited*, 539 F.3d 693, 697 (7th Cir.2008).

This Court reviews *de novo* the sufficiency of an affidavit in support of a warrant to search. *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir.2010). Probable cause to issue a warrant and authorize a search exists if the affidavit "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Watzman*, 486 F.3d 1004, 1007 (7th Cir.2007); *see Ornelas v. United States*, 517 U.S. 690, 696 (1996). This Court evaluates probable cause based on the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230–32 (1983), but affords great deference to the decisions of the judge issuing the warrant, as long as the judge had a substantial basis for the finding. *See Aljabari*, 626 F.3d at 944; *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir.2008); *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir.2008).

This Court reviews *de novo* a district court's finding that the good-faith exception applies to a particular warrant. *United States v. Bell*, 585 F.3d 1045, 1052

(7th Cir. 2009).

**B.    Legal Principles**

The Fourth Amendment confers a right to security of person, home, papers, and effects against unreasonable searches and seizures by the authorities. U.S. Const. amend IV. Search warrants must be supported by probable cause to satisfy the dictates of the Fourth Amendment. *United States v. Harris*, 403 U.S. 573, 577 (1971). Probable cause exists only when the affidavit sets forth sufficient facts that would lead a prudent person to believe "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

When the issue of staleness arises in the context of a probable cause determination for a search warrant, the question is whether, at the time of the application for the warrant, there is a fair probability that a crime has been committed and that the items to be seized will be in the place searched. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (*citing Sgro v. United States*, 287 U.S. 206 (1932)). Similar to general probable cause analysis, staleness is not amenable to technical "bright-line" rules. *See United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993). Nor is it intended "to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988). Rather, staleness is a flexible concept that turns, in significant part, upon the nature of the crime at issue. *See United*

19

*States v Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983).

### C.     Argument

#### 1.     *Insufficient Evidence to Establish Probable Cause*

Agent Haferkamp's affidavit for search warrant failed to set forth

sufficient facts that would lead a neutral and detached magistrate reasonably to

conclude that there was probable cause to believe that evidence of child

pornography would be present at Mr. Seiver's residence. *Illinois v. Gates*, 462 U.S.

213 (1983); *Sgro v. United States*, 287 U.S. 206 (1932). Indeed, the only reference in

the agent's affidavit where child pornography was traced to Mr. Seiver's IP

address was the January 7, 2010, facebook message sent by "David Smith" to

"D.W." That email contained a link to a yfrog.com page that included 16 digital

images, only two of which were child pornography. Over seven months after the

email was sent, Agent Haferkamp appeared before Magistrate Judge Shields on

August 16, 2010, and requested issuance of the search warrant. Over seven

months after the fact is too long a time under the facts of this case to establish that

there was any likelihood that there would be any evidence of any crime, let alone

any crime related to the email, at Mr. Seiver's residence. Such information is too

stale and remote to establish probable cause that evidence of child pornography

would be present at the Defendant's residence at the time of the issuance of the

warrant. Moreover, unlike other cases where the application for search warrant

recites multiple uploads of child pornography, or multiple distributions of child

pornography through the use of file-sharing software, here such evidence of

"David Smith's" single email message to the teenage girl's step-mother,

accompanied by a link containing sixteen digital images, only two of which

constituted child pornography, fails to establish any continuing course of

criminal conduct on which probable cause for a search warrant could be based.

### a.    Information Over Seven Months Old Stale

This Court has found that information that was four years old, without any

new information that tied the defendant to a sexual interest in children, was stale

and the warrant, as a result, lacked probable cause. *United States v. Prideaux-*

*Wentz*, 543 F.3d 954, 958 (7th Cir. 2008). While the information in this case was

over seven months old, this Court's teachings in *Prideaux-Wentz* lead to the

conclusion that the evidence in this case was also stale.

In *Prideaux-Wentz*, agents received nineteen tips, between August 15, 2003,

and January 28, 2004, that the defendant uploaded sixty-nine images, that the

agent identified as child pornography or child erotica, to different Yahoo!

accounts. *Prideaux-Wentz*, 543 F.3d at 956. The agent submitted the application for

a warrant on January 31, 2006. *Prideaux-Wentz*, 543 F.3d at 956. The affidavit also

included boilerplate about collectors of child pornography and definitions of

many computer terms, as well as a detailed explanation of server accounts and

how they work. *Prideaux-Wentz*, 543 F.3d at 956-957. This Court found that the

affidavit lacked probable cause because the evidence upon which the agent relied

was stale. *Prideaux-Wentz*, 543 F.3d at 958. This Court was particularly concerned that there was no evidence of when the images were uploaded. *Prideaux-Wentz*, 543 F.3d at 958. Additionally, this Court noted that there was no newer evidence to freshen the older evidence. *Prideaux-Wentz*, 543 F.3d at 958.

This Court noted that "the staleness argument takes on a different meaning in the context of child pornography because of the fact that collectors and distributors rarely, if ever, dispose of their collections." *Prideaux-Wentz*, 543 F.3d at 958. This Court also said, though, that "there must be some limitation on this principle." *Prideaux-Wentz*, 543 F.3d at 958. This Court then distinguished the facts of the case from those of *United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005), a case where this Court rejected a staleness argument based on evidence gathered more than a year from the request for a warrant. This Court explained that in *Newsom*: "the government also had other, more recent evidence of continuing criminal activity to bolster probable cause and to freshen the older information." *Prideaux-Wentz*, 543 F.3d at 958 (*citing Newsom*, 402 F.3d at 783) (where police did not base the search warrant on the year-old pornographic images alone but also relied on the recent discovery by the defendant's girlfriend of a pornographic tape of her minor daughter).

In this case, there was far less evidence than there was in *Prideaux-Wentz* or *Newsom*. The only evidence in this case that Mr. Seiver ever had any child pornography was one upload to a server. Moreover, he the only apparent reason

that he uploaded the images was so that he could then create a link to them to support his email to the step-mother. Therefore, once he sent the email, he had no more use for the upload. Also, since there is no additional evidence about Mr. Seiver's connection to any child pornography in the affidavit, there is no evidence that he had any more need or use for the images he uploaded. As a result, it is distinguishable from this Court's case in *United States v. Singer*, 943 F.2d 758, 764 (7th Cir. 1991), where this Court upheld the use of evidence six months to support an request for a no-knock warrant in a gun case. In *Singer*, this Court found that the evidence was not stale in large part because "firearms, unlike drugs, are durable goods useful to their owners for long periods of time." *Singer*, 943 F.2d at 763. By contrast, in this case, because Mr. Seiver put the images to a particular, anti-crime use, there is insufficient evidence to establish that those pictures would be on Mr. Seiver's computer over seven months after he used them.

The images are not, necessarily, durable goods and may be lost in any number of ways, including power outages and other acts of nature, as well as by the action of the computer, depending on where the images are stored. There was no evidence in the affidavit to establish where the images were located when they were uploaded. If they were in the unallocated space of the hard drive, a space which includes the internet cache and includes any files or images that were "deleted," they would be automatically overwritten as the computer was

being used. *See United States v. Haymond*, 2012 U.S. App. LEXIS 4652 *8 n. 8 (10th Cir. March 6, 2012) ("The 'unallocated space' of a computer's hard drive consists of files which do not have a formal file structure and can include deleted files. It is 'where deleted data is stored before it is then overwritten with new data.'" *United States v. Otero*, 563 F.3d 1127, 1131 (10th Cir. 2009)). As the Fifth Circuit recently explained in some detail:

> When a computer user views a webpage, the computer automatically stores a copy of that webpage in a folder known as the cache. The copy is retained in a file called a temporary internet file. When the user revisits that webpage, the computer can load the page more quickly by retrieving the version stored in the cache. The computer automatically deletes temporary internet files when the cache — which has limited storage space — becomes full. Once full, the computer begins to delete the files on a "first in, first out" basis. Users also may manually delete files from the cache, or use commercial software to remove the files.
>
> Deleted files are not wholly removed from the computer. A deleted file is marked as unallocated file space, which allows that file to be overwritten by new files. A computer's deleted files make up what is known, in this case, as the disk slack space. A knowledgeable forensic investigator may use forensic software to search for, recall, and view the contents of the unallocated file space. This process is known as "restoring" a deleted, but not yet overwritten, file. It requires sophisticated expertise and special software to restore a deleted file.

*United States v. Moreland*, 665 F.3d 137, 142-143 (5th Cir. 2011) (citations omitted).

As a result, depending on where the images were on the computer, they may well have been overwritten soon after the email simply by operation of Mr. Seiver's computer.

Because there was no additional use for the images apparent from the facts of this case, this Court should not consider them as durable goods, like a gun. As a result, the facts of this case are distinguishable from those this Court found important to find six months for information about a gun not to be stale in *Singer*. This case involves evidence more like drugs, because they were only used once. This Court distinguished drugs from guns in Singer and implied that six months might well be too long a time between offense and warrant if the subject were simply drugs. *Singer*, 943 F.2d at 763. ("firearms, unlike drugs, are durable goods useful to their owners for long periods of time."). Because the images in this case are more like drugs, this Court should find that the evidence in the affidavit was stale.

Finally, in this case there was no newer evidence to freshen the older evidence. This alone sufficiently distinguishes the facts of this case from those of *Prideaux-Wentz* or *Newsom*. As a result, the evidence in this case that was over seven months old was stale and cannot be used to establish probable cause.

> **b.    *Boilerplate Language Should Not Help Establish Probable Cause***

This Court has recently addressed the use of boilerplate language in affidavits to support probable cause the context of child pornography offenses. *United States v. Clark*, ___ F.3d ___, 2012 WL 470264 (7th Cir., Feb. 13, 2012). This Court noted that boilerplate language about the tendencies of child pornography

collectors only supports probable cause for a search when the affidavit also includes facts that suggest the target of the search "has the characteristics of a prototypical child pornography collector." *Clark*, ___ F.3d ___, 2012 WL 470264 *5 (*quoting United States v. Prideaux–Wentz*, 543 F.3d 954, 960 (7th Cir. 2008). This Court has recognized that no one or "magic" profile for child pornography collectors exists. *See United States v. Pappas*, 592 F.3d 799, 803–04 (7th Cir.2010). Rather, the target of the search's demonstrable sexual interest in children, along with the use of a computer in acting on that interest, sufficiently connects him to the "collector" profile to justify including the boilerplate language. *Clark*, ___ F.3d ___, 2012 WL 470264 *5.

In the affidavit prepared in this case, SA Haferkamp included language about some of the typical characteristics of individuals who posses child pornography. In particular, SA Haferkamp included information about the tendency of individuals who possess child pornography to maintain their "collections" at their residences for several years. App. 38-40. This language was included in the affidavit specifically to deal with the issue of staleness. However, because there was insufficient evidence to establish that Mr. Seiver was a collector, this boilerplate cannot help establish probable cause. As a result, the information was stale.

The only evidence that Mr. Seiver even had pictures at all was that he uploaded two pictures of child pornography to a website over seven months

before the agent requested a warrant. Otherwise, there was no evidence about Mr. Seiver's possession of these images. For instance, there was no evidence that Mr. Seiver kept these images in a particular file or a special recording device. For all the agent knew, the images were taken from Mr. Seiver's internet cache, the place where all images seen on the internet are automatically saved. *See United States v. Dobbs*, 629 F.3d 1199, 1201-1202 (10th Cir. 2011) ("a user does not necessarily have to see an image for it to be captured by the computer's automatic-cache function"). Without any information particular to Mr. Seiver, the agent had no information that Mr. Seiver had any sexual interest in children. In fact, the email to the step-mother, informing her of her daughter's pictures and advising her to stop her step-daughter from continuing, was not consistent with the behavior of someone who valued these pictures at all, let alone for sexual reasons.

This Court recently addressed the use of a collector profile in an application for a warrant in *Clark*, ___ F.3d ___, 2012 WL 470264. In *Clark*, the officer did not provide an example of the defendant downloading child pornography. *Clark*, ___ F.3d ___, 2012 WL 470264 *5. This Court found that such an example was not necessary under the facts of the case to establish the defendant's sexual interest in children and connect him to the "collector" profile. *Clark*, ___ F.3d ___, 2012 WL 470264 *5. Instead, the officer's affidavit extensively described the defendant's sexual assault on his four-year-old niece. *Clark*, ___

27

F.3d ___, 2012 WL 470264 *5. It further detailed his sexual advances on a nine-year-old boy and another six-year-old girl. *Clark*, ___ F.3d ___, 2012 WL 470264 *5. In short, the affidavit documented the defendant's particular, sexual attraction to children and his willingness to act on his proclivities. *Clark*, ___ F.3d ___, 2012 WL 470264 *5. As a result, the affidavit thus placed him at the heart of the boilerplate language: as an individual associated with sex offenses involving minors, he likely "collect[ed] and/or view[ed] images on the computer." *Clark*, ___ F.3d ___, 2012 WL 470264 *5.

By contrast, the facts in the affidavit in this case do not establish that Mr. Seiver had any sexual interest in children. The uploads were of one teenager. There was nothing in Mr. Seiver's message to the teenager's step-mother that indicated that he had anything but revulsion for what the teenager had done. In addition to the warning to the step-mother, Mr. Seiver exhorted the step-mother to stop her child from continuing this behavior. As a result, the facts of this case stand in stark contrast to those in *Clark*.

The *Clark* panel also addressed the second prong of analysis the court uses to evaluate the usefulness of boilerplate language in an affidavit to establish probable cause in a child pornography case. There, the evidence must establish that the use of a computer in acting on a demonstrable sexual interest in children. In *Clark*, the officer's affidavit provided evidence that the defendant used a computer—a probable repository for child pornography—as part of his

advances. *Clark*, ___ F.3d ___, 2012 WL 470264 *5. In *Clark*, these details, too, helped support probable cause to connect the defendant to the "collector" profile and to conduct an appurtenant search. Specifically, in *Clark*, the defendant watched pornography on his computer while concurrently asking a six-year-old girl to take her clothes off. *Clark*, ___ F.3d ___, 2012 WL 470264 *5.

Facially, in *Clark*, the affidavit provided probable cause to search. By contrast, the affidavit in this case does not support the proposition that Mr. Seiver's use of a computer helped him to act on a sexual interest in children. First, as argued above, the evidence in the affidavit did not support the proposition that Mr. Seiver had a sexual interest in children. Second, Mr. Seiver used the computer to notify the teenager's step-mother and to tell her to stop her step-daughter. Even Mr. Seiver's uploading the images to the server does not appear to have been accomplished to help him to act on a sexual interest in children. Instead, the evidence establishes that he uploaded the images to create the link for the email to the step-mother. In this case, there was no evidence that Mr. Seiver was a collector. No prototypical "collector" of child pornography would send an email, via facebook.com, to a teenage girl's step-mother containing a link to a website showing images of the errant teenager posting lewd and lascivious visual images of herself on the internet. As a result, unlike *Clark*, the facts in the affidavit in this case do not support the court's reliance on any boilerplate language in the affidavit because the government was not able to establish that

29

Mr. Seiver fit the profile of a collector of child pornography. In order to rely on profiles, "the affidavit must lay a foundation which shows that the person subject to the search is a member of the class." *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir.1990) (holding that the affidavit did not establish probable cause that the defendant was a child molester when it was "clear that the 'expert' portion of the affidavit was not drafted with the facts of this case or this particular defendant in mind").

As compared to the facts in this case, there were many more facts to support the application for a warrant in *United States v. Pappas*, 592 F.3d 799, 803 (7th Cir. 2010), a case where this Court suggested that there was insufficient evidence to establish probable cause. In *Pappas*, the government's main evidence against the defendant was that the defendant had received eleven emails that included child pornography over a 3 week period. *Pappas*, 592 F.3d at 801. The government could not even say whether the defendant had solicited the emails or whether he had even opened them. *Pappas*, 592 F.3d at 802. However, the government attempted to bolster the application with the officer's vast experience (ten years investigating sexual exploitation of minors), a description of the typical behavior of individuals who collect, procure, and distribute child pornography, and a description of the emails that had been sent to the defendant, including descriptions of the pornography as well as three of the email transmissions. *Pappas*, 592 F.3d at 801. Additionally, the agent noted that the

defendant continued to maintain an email account, albeit a different one then the one to which the emails had been sent. *Pappas*, 592 F.3d at 801. The agents requested and obtained the warrant 18 months after the emails had been sent. *Pappas*, 592 F.3d at 801.

In *Pappas*, the district court granted the defendant's motion to suppress. *Pappas*, 592 F.3d at 802. The district court found that there was insufficient evidence to establish probable cause and that the good faith exception did not apply because the warrant was so lacking in probable cause that the officers could not rely upon it. *Pappas*, 592 F.3d at 802. The government appealed and this Court disagreed with the district court's latter finding. *Pappas*, 592 F.3d at 802. In support of this Court's ruling, this Court noted that "where evidence indicates that an individual has uploaded or possessed multiple pieces of child pornography, there is enough of a connection to the 'collector' profile to justify including the child pornography collector boilerplate in a search warrant affidavit." *Pappas*, 592 F.3d at 804. This Court concluded that the eleven emails that had been sent to the defendant justified the inclusion of the child pornography boilerplate. *Pappas*, 592 F.3d at 804.

By contrast, in this case, there was only one upload that was associated with an email to the step-mother of the subject of the child pornography. There is nothing in this evidence that would create enough of a connection to the collector profile. As a result, unlike *Pappas*, the boilerplate language in the affidavit in this

case should lend nothing to the question of whether there was probable cause in this case to justify the issuance of the warrant.

### 2.    *Good Faith Exception Should not Apply*

The district alternatively held that even if there was insufficient evidence to establish probable cause, the officers relied in good faith on the warrant. *See United States v. Leon*, 468 U.S. 897, 924 (1984). It is well settled that "suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied on good faith on the issuing judge's finding of probable cause." *United States v. Watts*, 535 F.3d 650, 565-57 (7th Cir. 2008) (*citing Leon*, 468 U.S. at 920). An officer's decision to obtain a warrant is *prima facie* evidence that he was acting in good faith. *Leon*, 468 U.S. at 921 n. 21. A defendant may rebut this evidence by demonstrating that the issuing judge failed to perform his neutral and detached function and served as a rubber stamp for the police; that the officer was dishonest or reckless in preparing the affidavit; or that the affidavit was so lacking in probable cause that no officer could have reasonably relied on it. *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008).

Agent Haferkamp's affidavit is so conclusory in its allegations and so plainly deficient in establishing probable cause to search the Defendant's residence that no reasonably trained officer would believe, in good faith, that the warrant was valid. *United States v. Leon*, 468 U.S. 897, 923 (1984)(fruits of a search

pursuant to a warrant should not be suppressed unless the officers who

conducted it could not reasonably have believed that the warrant was supported

by probable cause); *Owens v. United States*, 387 F.3d 607 (7th Cir. 2004)(affidavit

deficient where it alleged crack sale at house three months earlier and little else);

*United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir.2002)("The good faith

exception to the exclusionary rule is not a magic lamp for police officers to rub

whenever they find themselves in trouble"; no good faith where information was

stale, investigation was minimal, and warrant authorized search for items when

nothing in affidavit indicated that such items would be present at defendant's

home); *United States v. Weaver*, 99 F.3d 1372, 1380-81 (6th Cir. 1996); *United States*

*v. Hython*, 443 F.3d 480, 488-89 (6th Cir. 2006)(reliance unreasonable where

affidavit detailed only one controlled purchase, failed to provide date of that

transaction, and contained no evidence of ongoing criminal activity).

Although this Court found that there was insufficient evidence to establish

probable cause in *Prideaux-Wentz* and suggested the same in *Pappas*, this Court

nevertheless upheld the warrants in these cases based on the good faith

exception. Because the facts of this case upon which the government relied to

establish probable cause were so much weaker than they were in either *Prideaux-*

*Wentz* or *Pappas*, this Court's holding in these cases are not controlling in this

case. In *Prideaux-Wentz*, the information was stale, but the information itself

included evidence that the defendant uploaded sixty-nine images to several

33

different Yahoo! e-groups, "pictures that Agent Paulson identified as both child pornography and child erotica." *Prideaux-Wentz*, 543 F.3d at 956. By contrast, in this case there was a sole upload to a service provider, the only reason for which appears to have been to notify the step-mother of her step-daughter's activities. As a result, the agent in this case was relying almost entirely on the boilerplate about collectors to make up for both the lack of evidence and its staleness.

This Court found in *Prideaux-Wentz* found that there was sufficient evidence to connect the defendant to the collector profile. *Prideaux-Wentz*, 543 F.3d at 961. However, the same cannot be said for the evidence in this case. In *Prideaux-Wentz*, this court was persuaded by the fact that the warrant connected the defendant to several email accounts responsible for uploading or possessing child pornography. *Prideaux-Wentz*, 543 F.3d at 961. This Court concluded that it was not too much of an inference to conclude that the defendant possessed child pornography. *Prideaux-Wentz*, 543 F.3d at 961. By contrast, in this case, as argued above, there is practically no evidence that Mr. Seiver fit the profile of a collector of child pornography. As a result, the facts of this case are distinguishable from the facts in *Prideaux-Wentz*, 543 F.3d at 956.

They are also distinguishable from the facts in *Pappas*. In *Pappas*, this court found that the boilerplate about collectors could be considered because the defendant received eleven different emails of pornography. *Pappas*, 592 F.3d at 804. Additionally, this Court credited the officers suspicious take on the facts by

34

finding that the officer could reasonably believe that: "the number of email messages containing child pornography sent to Pappas, and the risk inherent in sending even one image of child pornography to anyone other than a willful recipient, was sufficient to establish probable cause ..." *Pappas*, 592 F.3d at 802-03. This Court found that the investigating officer's affidavit supporting warrant to search defendant's home for images of child pornography e-mailed to his computer was not so lacking in indicia of probable cause as to preclude reasonable officer from relying on affidavit in good faith, despite 18-month delay between transmission of e-mails and issuance of warrant, since the affidavit documented evidence establishing that at least 11 child pornography images were sent to defendant's e-mail account, thereby justifying affidavit's boilerplate regarding profile of child pornography collector, the affidavit verified defendant's continued access to e-mail account and computer on which child pornography could be stored, and the investigating officer consulted with prosecutor prior to seeking warrant. *Pappas*, 592 F.3d at 802-804.

By contrast, in this case there was only one upload, one that appeared to have been done exclusively to create a link to warn a minor's step-mother of the minor's activities. Moreover, as argued above, there was insufficient evidence to establish that Mr. Seiver could be considered a collector of child pornography. As a result, this Court's conclusions in these other cases that the warrant should be saved by the good faith exception should not prevent this Court from concluding

in this case that the good faith exception should not apply. Under the facts of this case, this Court should conclude that the affidavit was so lacking in probable cause that no officer could have reasonably relied on it.

**CONCLUSION**

For all of the foregoing reasons stated above, this Court should reverse the

District Court's denial of Mr. Seiver's motion to suppress evidence, and remand

this cause to the District Court for further proceedings.

                              Respectfully submitted,

                              JONATHAN E. HAWLEY
                              Chief Federal Public Defender

                              GEORGE F. TASEFF
                              Senior Litigator

                    By:       /s Andrew J. McGowan
                              ANDREW J. MCGOWAN
                              Staff Attorney

                              Attorneys for Defendant-Appellant,
                              RONALD A. SEIVER

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C)**

The undersigned certifies that this brief complies with the volume

limitations of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32

in that it contains 8,473 words, and 723 lines of text as shown by Word Perfect X3

used in preparing this brief.

/s Andrew J. McGowan

ANDREW J. MCGOWAN
Staff Attorney

Dated:  March 21, 2012

No. 11-3716

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

RONALD A. SEIVER,
Defendant-Appellant.

Appeal From the United States District Court
For the Central District of Illinois, Rock Island Division
Case No. 10 CR 40091
The Honorable Judge James E. Shadid

REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, RONALD A. SEIVER

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
401 Main Street, Suite 1500
Peoria, Illinois  61602
Telephone:   (309) 671-7891
Fax:           (309) 671-7898

JONATHAN E. HAWLEY
Federal Public Defender

JOHANNA CHRISTIANSEN
Appellate Division Chief

ANDREW J. MCGOWAN
Staff Attorney

Attorneys for Defendant-Appellant,
RONALD A. SEIVER

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of

the materials required by Circuit Rule 30(a) and 30(b) are included in the

Appendix to this brief.


By:   /s Andrew J. McGowan

ANDREW J. MCGOWAN
Staff Attorney

Date:  March 21, 2012

# APPENDIX TABLE OF CONTENTS

Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Notice of Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

Judgment in a Criminal Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-10

Order Denying Motion to Suppress.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-18

Search and Seizure Warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Application for Search and Seizure Warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Affidavit in Support of Application for Search Warrant. . . . . . . . . . . . . . . . . 22-44

No. 11-3716

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District Court for the Central District of Illinois, Rock Island Division |
| Plaintiff-Appellee, | |
| vs. | Case No. 10 CR 40091 |
| RONALD A. SEIVER, | Hon. James E. Shadid, United States District Judge, Presiding. |
| Defendant-Appellant. | |

## NOTICE OF FILING AND PROOF OF SERVICE

TO:   Mr. Gino Agnello, Clerk, United States Court of Appeals, 219 S. Dearborn St., Chicago, IL 60604

Michael D. McCoy, Office of the United States Attorney, 1830 Second Ave., Rock Island, IL 61201

Mr. Ronald Seiver, Reg. No. 17217-026, FCI McDowell, P.O. Box 1009, Welch, WV 24801

I hereby certify that on March 21, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier within 3 calendar days, to the non-CM/ECF participants.

BY:   /s Andrew J. McGowan
ANDREW J. MCGOWAN
Staff Attorney
401 Main Street, Suite 1500
Peoria, Illinois 61602
Phone: (309) 671-7891

**E-FILED**
Monday, 05 December, 2011  10:29:54 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND  DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Crim. No. 10-40091 |
| | ) |
| RONALD ALAN SEIVER, | ) |
| | ) |
| Defendant. | ) |

<u>NOTICE OF APPEAL</u>

Notice is hereby given that the Defendant, RONALD ALAN SEIVER, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the sentence imposed  November 30, 2011, and written judgment entered December 1, 2011, sentencing the Defendant to a term of  imprisonment of one hundred twenty months on Count 1, and  a term of imprisonment of three hundred months on Count 2, said terms to run consecutively, and a lifetime  period of supervised release.

RONALD ALAN SEIVER, Defendant

/s/George F. Taseff
Assistant Federal Public Defender
401 Main Street, Suite 1500
Peoria, Illinois 61602
Phone: 309/671-7891
FAX:  309/671-7898
Email: george_taseff@fd.org

Date: <u>December 5, 2011</u>

Case: 11-3716     Document: 7     Filed: 03/21/2012     Pages: 93

E-FILED
Friday, 17 September, 2010  05:14:30 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## AT ROCK ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| RONALD ALAN SEIVER, | ) |
| | ) |
| Defendant. | ) |

Criminal No. 10- 4 0 0 9 1

VIO:  Title 18, United States Code,
Sections 2251(a) and (e),
2252A(a)(5)(B) and (b)(2), and 2253

**FILED**

SEP 1 5 2010

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## INDICTMENT

**THE GRAND JURY CHARGES:**

### COUNT ONE
### (Possession of Child Pornography)

On or about August 24, 2010, in Warren County, in the Central District of Illinois and

elsewhere, the defendant,

### RONALD ALAN SEIVER,

did knowingly possess material that contained at least 100 visual depictions of child pornography,

as defined in Title 18, United States Code § 2256(8), that had been mailed, and shipped and

transported in interstate and foreign commerce by any means, including by computer, and that was

produced using materials that had been mailed, and shipped and transported in interstate and

foreign commerce by any means, including by computer, all in violation of Title 18, United States

Code, Sections 2252A(a)(5)(B) and (b)(2).

## COUNT TWO
### (Sexual Exploitation of a Child)

From at least July 1, 2008, through at least October 31, 2008, in Champaign County, in the Central District of Illinois and elsewhere, the defendant,

### RONALD ALAN SEIVER,

did knowingly employ, persuade, induce, entice, and coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct knowing or having reason to know that such visual depiction would be transported or transmitted using any means or facility of interstate and foreign commerce and that the visual depiction was produced using materials that had been transported in interstate and foreign commerce, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

## FORFEITURE ALLEGATIONS

The allegations contained in Counts One and Two of this Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 2253.

From his engagement in the criminal violations alleged in Counts One and Two of this Indictment, the defendant,

### RONALD ALAN SEIVER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 2253, all interest in:

1.    Any visual depiction or other matter containing such visual depiction which was possessed as alleged above in this Indictment; and

- 2 -

2.      Any personal property used or intended to be used to commit or promote the commission of the offense charged above in this Indictment.

The property referred to above as items 1 and 2 includes, but is not limited to, the following:

a.      Acer Aspire Model 5720 Laptop Computer, bearing Serial Number 74110014116.

b.      SanDisk 16 Gigabyte (GB) Thumb Drive.

c.      Argus DC 1730 Digital Camera with 1 Gigabyte (GB) Memory Card, bearing Serial Number DC173003044167.

d.      Blackberry 8130 Cellular Telephone, bearing Serial Number ESN 07616343290.

e.      Kyrocera Cellular Telephone, bearing Serial Number F0000021425820.

All pursuant to Title 18, United States Code, Section 2253.

**A TRUE BILL**

s/Foreperson

**FOREPERSON**

s/Matthew Cannon

For C/JAMES A. LEWIS
**UNITED STATES ATTORNEY**
**MDM**

- 3 -

Case: 11-3716    Document: 7    Filed: 05/02/2012    E-FILED
Friday, 02 December, 2011 08:47:50 AM
Clerk, U.S. District Court, ILCD

AO 245B   (Rev. 12/03) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

**Central** ___ District of ___ **Illinois**

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| Ronald Alan Seiver | Case Number: 10-40091-001 |
| | USM Number: 17217-026 |
| | George F. Taseff |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1 & 2

☐ pleaded nolo contendere to count(s) ___
which was accepted by the court.

☐ was found guilty on count(s) ___
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C § 2252A(a)(5)(B) and (b)(2) | Possession of Child Pornography | 8/24/2010 | 1 |
| 18 U.S.C § 2251(a) and (e) | Sexual Exploitation of a Child | 11/30/2008 | 2 |

The defendant is sentenced as provided in pages 2 through ___**6**___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ___

☐ Count(s) ___ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**11/30/2011**

Date of Imposition of Judgment

s/James E. Shadid

Signature of Judge

James E. Shadid          U.S. District Judge

Name and Title of Judge

**12-1-11**

Date

AO 245B   (Rev. 12/03) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment — Page | 2 | of | 6 |

DEFENDANT: Ronald Alan Seiver
CASE NUMBER: 10-40091-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

120 months on Count 1 and 300 months on Count 2 to run consecutively.

☑ The court makes the following recommendations to the Bureau of Prisons:

It is recommended that the defendant serve his sentence in a facility as close to his family in Roseville, Illinois, as possible.  It is further recommended that he serve his sentence in a facility that will allow him to participate in the sex offender treatment program and/or other mental health treatment programs and maximize his exposure to educational and vocational opportunities.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before     p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
            Sheet 3 — Supervised Release

| | Judgment—Page | 3 | of | 6 |

DEFENDANT: Ronald Alan Selver
CASE NUMBER: 10-40091-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

    Counts 1 and 2: Life on each count to run concurrently.

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☒    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☒    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from ☐ excessive ☒ any use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 3C — Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT: Ronald Alan Seiver
CASE NUMBER: 10-40091-001

## SPECIAL CONDITIONS OF SUPERVISION

1. You shall refrain from any use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician. You shall, at the direction of the probation officer, participate in a program for substance abuse treatment including not more than six tests per month to determine whether you have used controlled substances and/or alcohol. You shall pay for these services as directed by the probation office.

2. You shall not own, purchase, or possess a firearm, ammunition, or other dangerous weapon.

3. You shall participate with the U.S. Probation Office's Computer and Internet Monitoring Program (CIMP) during your term of supervision. The monitoring program will start as soon as possible after your supervision term begins. You shall sign the rules of the Computer Internet and Monitoring Program and comply with the conditions of this program. During this time:

   A. You shall install filtering software on any computer you possess or use which will monitor/block access to sexually oriented websites. You shall allow the probation officer unannounced access to any computer you possess or use to verify that the filtering software is functional. You shall pay for the cost of the filtering software as directed by the probation officer.

   B. You shall submit to the search of your person, automobile, and property under your control by the probation officer. You shall also allow the probation officer to conduct periodic unannounced examinations of your computer equipment, Internet capable devices, similar electronic devices, related computer peripherals, which may include retrieval and copying of all data from your device to ensure compliance with this condition, and/or removal of such equipment for the purpose of conducting a more thorough inspection.

4. You shall have no contact with any person under the age of 18, except in the presence of a responsible adult who is aware of the nature of your background and current offense, and who has been approved by the probation officer.

5. You shall not receive or transmit any sexually arousing material, including child pornography, via the Internet nor visit any website, including chat rooms or bulletin boards, containing any sexually arousing material, including child pornography.

6. You shall register with the state sex offender registration agency in any state where you reside, are employed, carry on a vocation, or are a student, as directed by the probation officer.

7. You shall participate in a sex offender treatment program as deemed necessary by the probation office. You shall pay for such services as directed by the U.S. Probation Office. You will submit to physiological testing, including polygraph testing, which may be part of a sex offender treatment program as directed by the U.S. Probation Office. You shall pay for such services as directed by the U.S. Probation Office.

8. You shall neither possess nor have under your control any material, legal or illegal, that contains nudity or that depicts or alludes to sexual activity or depicts sexually arousing material. This includes, but is not limited to, any material obtained through access to any computer and/or communication device, including a computer and/or communication device for employment purposes, or any material linked to computer or communication device access or use.

AO 245B   (Rev. 12/03) Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties

|  |  |  |
|---|---|---|
| | Judgment — Page | 5 of 6 |

DEFENDANT: Ronald Alan Selver
CASE NUMBER: 10-40091-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

    ☐ the interest requirement for the  .☐ fine  ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
          Sheet 6 — Schedule of Payments

DEFENDANT:  Ronald Alan Seiver                                    Judgment — Page   6   of   6
CASE NUMBER:  10-40091-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  ☑  Lump sum payment of $ __200.00__ due immediately, balance due

     ☐  not later than _____ , or
     ☐  in accordance  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

|                           |     |                      |
|---------------------------|-----|----------------------|
| UNITED STATES OF AMERICA, | )   |                      |
|                           | )   |                      |
| Plaintiff,                | )   |                      |
|                           | )   |                      |
| v.                        | )   | Case No. 10-40091    |
|                           | )   |                      |
| RONALD ALAN SEIVER,       | )   |                      |
|                           | )   |                      |
| Defendant.                | )   |                      |

### O R D E R

This matter was before the Court on April 11, 2011, for a hearing on Defendant, Ronald Alan Seiver's ("Seiver"), Motion to Suppress Evidence. After hearing evidence and considering the arguments presented, the Motion to Suppress Evidence [#21] is DENIED.

### BACKGROUND

On January 7, 2010, a subject utilizing the facebook.com screen name "David Smith" sent a message to D.W. in London, Ontario, Canada, containing a link to a yfrog.com page containing child pornography and asking if D.W.'s daughter was the young girl shown in the photos. This incident was reported to the London Police Services on January 8, 2010, who began an investigation. The photos were ultimately determined to be still images taken from a video file uploaded by J.H., D.W.'s 13 year-old step-daughter, on blogtv.

Investigators determined that the IP address of the party that uploaded the photographs to yfrog.com was 74.36.163.43 and further traced this IP address to an account with Frontier Communications, 180 S. Clinton Avenue, Rochester, NY 14646. This information was then

forwarded to the Rochester Police Department in New York, the Royal Canadian Mounted Police National Child Exploitation Coordination Centre, and the ICE Attache in Ottawa, Canada, with an investigative referral. The matter was further forwarded to the ICE SAC in Buffalo, New York, and the RAC Springfield office, where the case was ultimately assigned to SA Haferkamp.

SA Haferkamp subpoenaed Frontier Communications for further information regarding the IP address in question. On April 28, 2010, Frontier Communications responded that the IP address 74.36.163.43 was assigned to Seiver, 1042 US HWY 67, Roseville, Illinois, 61473, at the time of the yfrog.com posting and facebook.com message. SA Haferkamp then ran a check to determine who resided at this address and found associations for Seiver, Brian Addis, April Addis, Jeanne Alexander, and Douglas Alexander, who are Seiver's brother-in-law, sister, mother, and step-father respectively.

On April 30, 2010, SA Haferkamp observed a vehicle parked outside the Roseville, Illinois, address and determined that it was registered to Jeanne and Douglas Alexander. On July 13, 2010, he then received information from Postal Inspector Larry Maxwell that Seiver, April Addis, Douglas Alexander, and Jeanne Alexander were all receiving mail at that address and that Brian Addis was forwarding his mail from that address to a post office box. Criminal history checks for each of these individuals came back negative on July 14, 2010, and on July 27, 2010, SA Haferkamp received confirmation that IP address 74.36.163.43 had uploaded the images to yfrog.com from the Roseville, Illinois, address.

With this in mind, SA Haferkamp obtained a search warrant for the premises of the Roseville, Illinois, address on August 16, 2010. At approximately 9:45 a.m. on August 24, 2010, the search warrant was executed. Various items of physical evidence, including a desktop computer, a laptop computer, and a flash drive were seized; Seiver was interviewed and placed under arrest and

charged with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and

(b)(2), and sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) and (e).

On December 10, 2010, Seiver filed his Motion to Suppress Evidence, raising essentially two

arguments: (1) the search was conducted in violation of the Fourth Amendment because the search

warrant affidavit failed to establish probable cause to believe that evidence of child pornography

would be found at the Roseville, Illinois, residence; and (2)(a)Seiver was in custody; and (b) Seiver's

statements during the interview on August 24, 2010, were involuntary and made without a knowing

and voluntary waiver of his Fifth Amendment rights.  This Order follows.

## DISCUSSION

I.     Probable Cause Claim

The Fourth Amendment allows a search of an individual's home "only if there is probable

cause to believe that the authorities will recover the items subject to seizure at the time they execute

the warrant." United States v. Newsom, 402 F.3d 780, 782 (7th Cir. 2005).  Seiver argues that the

evidence must be suppressed because the search warrant application was based on stale information

and therefore failed to establish probable cause to believe that evidence of child pornography would

be found at his residence.  Specifically, he contends that the information identifying the IP address

for the facebook.com message and yfrog.com posting was known in January 11, 2010, and Frontier

Communications had confirmed that the IP address was registered to him by April 28, 2010.

However, the search warrant was not obtained or executed until August 2010, nearly seven months

after the images were discovered and four months after the IP address was confirmed.

"While the recency of information contained in a search warrant application is one factor

bearing on the question of probable cause, there is no bright line for when information is stale." U.S.

v. Pappas, 592 F.3d 799, 803 (7th Cir. 2010).  Moreover, the Seventh Circuit has held that child

- 3 -

pornography warrants present a different standard for staleness than other types of cases given the nature of the material and tendency of individuals who view child pornography to store it and maintain their collections for long periods of time. Newsom, 402 F.3d at 783; United States v. Watzman, 486 F.3d 1004, 1008 (7th Cir. 2007).

The warrant application in this case explained that purveyors of child pornography tend to hold onto their "collections" for long periods of time. It is also apparent that SA Haferkamp did not base his application only on the images, but also relied on the evidentiary trail that was established confirming the link between Seiver and the IP address used to upload the images, as well as the residence in Roseville, Illinois. The Court therefore concludes that the information contained in the search warrant application was not stale and provided the requisite probable cause.

The Seventh Circuit has also upheld searches based on transmissions of child pornography up to four years old where the record indicates that officers have relied in good faith on a search warrant issued by a neutral magistrate based on such transmissions. Newsom, 402 F.3d at 783 (finding one-year-old information not necessarily stale as a matter of law in a child pornography case); United States v. Prideaux-Wentz, 543 F.3d 954, 958 (7th Cir. 2008) (holding that officers could reasonably rely on warrant issued by magistrate judge based on four-year-old transmissions.) Here, the affidavit documented evidence establishing that at least two images of child pornography had been uploaded to yfrog.com and attached to the facebook.com message to D.M., verifying that the IP address used to upload this material was registered to Seiver, and confirming that Seiver continued to reside at the address associated with that IP address. Additionally, Seiver makes no effort to challenge the neutrality of the magistrate judge issuing the warrant, and the record reveals that SA Haferkamp consulted with AUSA McCoy prior to seeking the warrant. It is well-settled that consulting "with the prosecutor prior to applying for [a] search warrant provides additional evidence

- 4 -

of [that officer's] objective good faith." Pappas, 592 F.3d at 802, *citing* United States v. Bynum, 293 F.3d 192, 198 (4th Cir. 2002). Thus, even if the information contained in the search warrant application could be deemed stale, the record would nevertheless support a finding of reasonable reliance by the officers that would also warrant the denial of this aspect of Seiver's Motion to Suppress Evidence.

II.    Voluntariness of Statements

Seiver next asserts that any statements made to SA Haferkamp or SA Thomas Berola during the August 24, 2010, interviews were made without any knowing, intelligent, or voluntary waiver of his rights under the Fifth Amendment and Miranda v. Arizona, 384 U.S. 436 (1966). In support of this argument, he relies on the repeated statements by the agents that he was not under arrest and that they had no plans to arrest him, as well as his awareness of his mother suffering a medical emergency and being transported to the hospital during the course of his interview.

The use of a defendant's involuntary statements against him in a criminal trial is a denial of due process of law. Jackson v. Denno, 378 U.S. 368, 376 (1964). In order to establish that a defendant's statements to officers were involuntary, the defendant must demonstrate that given the totality of the circumstances, law enforcement officials overbore the his rational intellect and free will. Haynes v. Washington, 373 U.S. 503, 513-14 (1963); Mincey v. Arizona, 437 U.S. 385, 399-401 (1978). In making this determination, the Court considers: (1) the conduct of law enforcement officials in creating pressure, and (2) the defendant's capacity to resist that pressure. Id.

The evidence presented indicates that Seiver was in his bedroom when officers entered the house en masse with weapons drawn. He was handcuffed and removed to an area outside the house. His handcuffs were removed, and he sat in a grassy area near the patio with an armed officer standing nearby. Approximately an hour later, he was taken back into the house and seated at one

of three chairs around the small kitchen table for an interview.  SA Haferkamp and SA Berola, both of whom are much larger men than Seiver, occupied the other two seats.  SA Berola advised Seiver that he was not under arrest and that he had no plans to arrest him, but went on to advise Seiver of his Miranda rights both verbally and in writing before questioning him.

Approximately fifteen minutes into the interview, an agent came into the kitchen and advised SA Berola to inquire about a younger looking female who was pictured engaged in a sexual act with Seiver.  Seiver admitted that he had traveled to Rantoul, Illinois, to meet this female and had sex with her on two occasions.  He further admitted that he knew that she was only 16 years old at the time and that he had taken pictures of them during one of their sexual encounters.

At some point during the interview, Seiver's mother began to complain of chest pain.  Agents brought her back into the house to lie down and called for an ambulance.  SA Berola asked Seiver if he knew what was wrong with his mother and if she was going to be alright.  Seiver responded that she had suffered a stroke approximately a year earlier and had fibromyalgia.  He did not ask to stop the interview or to take a break to check on his mother in the other room, and the agents made no such offers to him.  Seiver's mother was ultimately taken to the hospital by ambulance.

The interview lasted for approximately one hour, followed by a shorter interview seeking access to Seiver's various computer accounts.  At 2:15 p.m., Seiver was again advised of his Miranda rights and placed under arrest for possession and production of child pornography.

Seiver argues that by repeatedly reassuring him that he was not in custody, the officers deliberately misled him and induced him to make incriminating statements.  In United States v. Slaight, the Seventh Circuit noted:

> The Miranda rule forbids questioning a person who is in custody
> unless he is first told that he has certain rights, such as a right to
> remain silent.  If the rule is violated, the answers to the questions

> asked him are inadmissible in evidence. Police sometimes are restive
> under the restraints imposed by the rule and seek to circumvent it by
> avoiding the appearance of custody, since the rule does not apply to
> non-custodial interrogations. "Police recast what would otherwise be
> a custodial interrogation as a non-custodial interview by telling the
> suspect that he is not under arrest and that he is free to leave. . . ."

620 F.3d 816, 817 (7th Cir. 2010).

It has been said that custody for purposes of Miranda "is a state of mind." Id., at 820. When

the situation is such that a suspect reasonably does not believe that he is free to leave, he is in

custody regardless of officer's intentions. Id. The Court agrees with Seiver that under the

circumstances presented in this case, a reasonable person in his position would not have felt free to

leave or terminate the interview at will. Therefore, he was effectively in custody at the time he made

his statements.

That being said, the fact that the Court has found that Seiver was in custody at the time of

his interview does not change the outcome in this case, as the record demonstrates that he was fully

advised of his Miranda rights and made a knowing, voluntary, and intelligent waiver prior to

answering their questions. There is no claim that Seiver was injured or physically ill during the

course of the search. SA Haferkamp and SA Berola both testified credibly that Seiver was not

handcuffed during the interview and did not appear to be confused, incoherent, or under the

influence of alcohol or any narcotic. The tape recording does not reveal any promises or threats

made to coerce Seiver's statements, and it is undisputed that the agents' weapons were holstered at

that time.

Seiver suggests that his concern for his mother's well being made his statements involuntary,

but it is clear that he had waived his Miranda rights at least 15 minutes before his mother began to

display signs of distress. Moreover, a review of the audio recording of the interview does not reveal

any significant change in Seiver's tone or demeanor during or after this time, and he continued to answer questions in the same manner as he had previously.

Seiver further asserts that his statements were involuntary because he understood SA Bertola's assurance that he did not plan to arrest him to be a promise that anything he said during the interview would not result in his arrest or be used against him. This is simply not a reasonable interpretation, as it is untenable to simultaneously argue that a reasonable person in Seiver's position would have believed that he was in custody, yet could say whatever he wanted without being subject to arrest and/or the statements being used against him in any way.

The record indicates that the agents clearly explained his Miranda rights, and his responses confirm that he understood those rights. When he expressed concern that waiving his rights was equivalent to admitting guilt, SA Berola immediately clarified the implications of a waiver. Accordingly, the Court concludes that Seiver knowingly, voluntarily, and intelligently waived his Fifth Amendment rights and is not entitled to the exclusion of statements that he made during the interview following that waiver.

## CONCLUSION

For the reasons set forth above, Seiver's Motion to Suppress Evidence [#21] is DENIED. This matter remains set for pretrial conference on May 13, 2011, and jury trial on June 6, 2011.

ENTERED this 14th day of April, 2011.


s/ James E. Shadid
James E. Shadid
United States District Judge

- 8 -

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

AUG 27 2010

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) |
| 1042 US Highway 67, Roseville, Illinois, and all appurtenances thereto and improvements thereon | ) ) ) |

Case No. 10 - md - 4032

DEFENDANT'S EXHIBIT 2

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____Illinois_____

*(identify the person or describe the property to be searched and give its location):*
1042 US Highway 67, Roseville, Illinois, and all appurtenances thereto and improvements thereon, more particularly described in Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    ~~August 29, 2010~~  August 30, 2010
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Thomas J. Shields
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30).*
☐until, the facts justifying, the later specific date of _____

Date and time issued:  August 16, 2010 at 3:03 p.m.

*Judge's signature*

City and state:    Rock Island, Illinois

Thomas J. Shields, Chief U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>I0D7RLI0OTO0043 | Date and time warrant executed:<br>08/24/2010 at 0945 hrs | Copy of warrant and inventory left with:<br>Ronald Alan SEIVER |

Inventory made in the presence of :
Dwayne Haferkamp, Eric Bowers, and Ronald Alan SEIVER

Inventory of the property taken and name of any person(s) seized:

One EMachine EL1200 Serial Number PINAE0Y00584700228A3001.
One Acer Aspire 5720 Laptop Serial Number 74110014116.
One Argus DC1730 Digital Camera Serial Number DC173003044167.
One Black Berry 8130 & Cable ESN 07616343290.
One Kyocera Cell Phone & Cable Serial Number F000002142582Ø.
One San Disk 16 Giga Bite thumb drive.
One 1 Giga Bite SD Card
Five panties.
One Check Creation Kit.
One Mail Package from Chipman.
One Frontier Communications bill.
Three Verizon Documents.
Two Bags containing package" with counterfeit checks / money orders.
Twelve Compact Disks (CLD).
Twenty-Two DVDs.
Six 3½ floppy disk.
Fourteen VHS Tapes.
Ten mini DVDs.
Three Miscellaneous Documents.

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 8/27/2010

_Executing officer's signature_

Special Agent Dwayne Eyn. Haferkamp
_Printed name and title_

DEFENDANT'S
EXHIBIT
3

AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

AUG 1 6 2010

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )  Case No. 10-mc-4032 |
| 1042 US Highway 67, Roseville, Illinois, and all | ) |
| appurtenances thereto and improvements thereon | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Central_____ District of _____Illinois_____ *(identify the person or describe property to be searched and give its location):* at 1042 US Highway 67, Roseville, Illinois, and all appurtenances thereto and improvements thereon, more particularly described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*  See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ____18____ U.S.C. § 2252 & 2252A , and the application is based on these facts:  See attached Affidavit

☐ Continued on the attached sheet.

☑ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dwayne E. Haferkamp, Special Agent, ICE
*Printed name and title*

Sworn to before me and signed in my presence.

**DEFENDANT'S EXHIBIT 1**

_____
*Judge's signature*

Date:  ____08/16/2010____

Thomas J. Shields, Chief U.S. Magistrate Judge
*Printed name and title*

City and state:  Rock Island, Illinois

# AFFIDAVIT

I, Dwayne E. Haferkamp, being duly sworn, depose and state:

I am a Special Agent (SA) with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), assigned to the Resident Agent in Charge in Springfield, Illinois. I have been employed as a Special Agent since August of 2009. As part of my duties as an ICE agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A. I have received training in the area of child pornography and child exploitation at the Federal Law Enforcement Training Center in Glynco, Georgia and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256)[1] in various forms of media including that of computer media.

2. This Affidavit is made in support of an application for a warrant to search the premises located at 1042 US Highway 67, Roseville, Illinois 61473 (hereinafter known as the "SUBJECT PREMISES") described below in this affidavit and in Attachment A. The SUBJECT PREMISES to be searched is more particularly described as: a two story farm house with light green siding and brown shingles on the roof. The residence has a natural-wood colored split-rail fence located on the West side of the house partially

---

1 "Child Pornography means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where – (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; . . . [or] (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." For conduct occurring after April 30, 2003, the definition also includes "(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

covering the patio area. There are also two concrete porches with coverings, one located to the South and the other to the East of the house. The house number, "1042," is displayed in yellow on the mailbox that is located across 105 Avenue to the South of the house. Immediately adjacent to the house are two structures. The first is more particularly described as a shed like structure located to the North West of the house. The shed has yellow colored siding and a light in color metallic roof. The second structure is a large modern barn with all white siding. The large barn has two entry/exit points; a two car garage sized door on the West side, and a larger entry/exit point to the North side of the structure. These two out buildings are close enough in proximity to the house that if wired to as such may be used to store a computer that is either directly or indirectly connected to the Internet Service Provider (ISP) located at the premises.

3. The purpose of this application is to seize evidence, as specified in Attachment B of this affidavit, of violations of 18 U.S.C. Section 2252A(a)(2), Receipt or Distribution of Child Pornography, and 18 U.S.C. Section 2252A(a)(5)(B), Possession of Child Pornography.

4. The facts set forth in this affidavit are based upon my personal observations and training, and where noted, information related to me by other law enforcement officials and witnesses. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES within a computer, related peripherals and computer media found at the SUBJECT PREMISES. Where statements

of others are set forth in this Affidavit, they are set forth in substance and in part.

5. As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, are present at the SUBJECT PREMISES.

### Brief Summary

6. As set forth in greater detail below, this investigation was initiated by ICE after an individual utilizing the screen name/user name "DAVID SMITH" on facebook.com sent a link via fecebook.com to the stepmother of a thirteen year old female that contained pornographic images of the 13 year old female.

7. As set forth below, the screen name/user name "DAVID SMITH" was used to access facebook.com. "DAVID SMITH" sent a link to the 13 year old female's stepmother. The link was to pornographic images located on yfrog.com (aka Imageshack) of her thirteen year old stepdaughter.  The images located at yfrog.com were verified by the London Police Service in Ontario, Canada, to be the images of the thirteen year old victim.  The images were subsequently removed from viewing on the site.  The images of child pornography were uploaded to yfrog.com on 01/08/2010 at 02:22:18 GMT from IP address 74.36.163.43, subsequently identified to be assigned to **RON SEIVER** at the SUBJECT PREMISES. On 01/08/2010 someone at the SUBJECT PREMISES possessed images of child pornography on a computer that is located at the SUBJECT PREMISES and posted those images of child pornography to yfrog.com through the internet.  I believe someone living at the SUBJECT PREMISES used at least one computer

(hereinafter described as the "SUSPECT COMPUTER") from the SUBJECT PREMISES (the location where the IP address resolves back to) to post child pornography on the yfrog.com website over the internet.

## Terminology and Definitions

8. In this affidavit, "child pornography," "visual depiction,"  "minor," and "sexually explicit conduct" are defined as set forth in Title 18, United States Code, Section 2256.

A. *Computers and Child Pornography* - Based on my knowledge, training and experience, and the experience and training of other law enforcement officers with whom I have had discussions, I know computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these images on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

B. The development of computers has changed this; computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

C. Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

D. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution.

E. *Internet* - The Internet is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information. Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located in the same state.

F. *Internet Service Providers* - Any individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving

electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

G. *IP Addresses* - An Internet Protocol address ("IP address") is a unique numeric address used by each computer on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

H. When a customer logs into the Internet using the service of an ISP, the computer used by the customer is assigned an IP address by the ISP. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.

I. The term "Online Chat Room" is defined as the real time visual interface which displays messages and responses of participants who are using online chat. Chat rooms are usually devoted to specific topics such as US politics; however, there are a number of general chat rooms which are devoted to

any issue the participants wish to bring up. Participants usually communicate by typing their contributions into a simple text box line by line. The primary use of a chat room is to share information via text with a group of other users. New technology has enabled the use of file sharing and webcams to be included in some programs and almost all Internet chat rooms or messaging services allow users to display and/or send pictures.

 J. The term "Open Source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

 K. The term "Web site" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

 L. The term "Computer system and related peripherals, and computer media" as used in this affidavit refers to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, Graphic Interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats, including, but not limited to, JPG, GIF, TIF, AVI, and MPEG.

## Probable Cause

9. On January 7, 2010 at 9:30 P.M. a subject utilizing facebook.com screen name/user name "DAVID SMITH" sent a message to D.W.. The message contained a link to a yfrog.com page that contained child pornography. The link was accompanied with the following message: "is J.H. ur daughter? U need 2 tell dat slut 2 stop getting naked on cam on blogtv n on msn 4 ppl. she also say she had sex over 100 times since she was 9 yrs old." D.W. replied 50 minutes later stating "I don't know what you are talking about... but I'm going to report you & block!!!!!!!"

10. The incident referenced in paragraph 9 above was reported to the London Police Services (LPS) on January 8, 2010 at 1440 hours by M.H. (DOB 12/16/1959). M.H. is the father of J.H. (DOB 08/14/1996), who is the thirteen year old girl pictured in the yfrog.com link. J.H. resides in London, Ontario, Canada, with her father, M.H., and her step-mother, D.W.. Police Constable (PC) Jennifer Smith was assigned to conduct interviews related to this incident. During her interview of D.W., D.W. told PC Smith that she had received a message from a "DAVID SMITH" on facebook with a link to pictures of her step daughter J.H.. D.W. stated that there were "about 20 or so pictures" of J.H. posing in different positions. "Some with her top down, some with no pants on, leaning back in the chair, leaning forward where it's close up. It's J.H.'s face, I'm not sure about her body parts, and I'm not sure where it's taken." D.W. then gave her facebook.com and yahoo.com account information to PC Smith, and provided PC Smith with permission to access the accounts.

11. PC Smith next interviewed J.H.. J.H. was asked if she knew where the pictures on yfrog.com had come from and she stated "No, I'm confused about that." J.H.

stated that she saw the pictures PC Smith was relating to and confirmed that the face in the pictures was hers, but then stated that she had not looked at the body of the person in the photographs. J.H. then denied having a blogtv account. When PC Smith informed J.H. that she knew J.H. had a blogtv account because she had already seen it, J.H. recanted and stated that she used to have an account: "Iloveyoubaby1996." J.H. stated that she was last on her blogtv account about a week and a half prior to the interview. J.H. was asked to give her account information to PC Smith, but J.H. told PC Smith that she did not remember the password to the account. J.H. also stated that she did not know a "DAVID SMITH." J.H. then stated that she had taken photos of herself on a webcam before but not naked photographs. J.H. was not aware of how these pictures may have gotten on the internet. J.H. stated that she has never used her webcam to take private pictures of herself for anyone else's benefit. J.H. then went on to give PC Smith her facebook name and password, as well as her e-mail address. PC Smith then advised J.H. that the cyber crimes unit would use this and other information to find out where the pictures had originated and how they got there. In response, J.H. stated "The only time I have ever taken one was the first time I went on blogtv and it was just my boobs because I didn't know that people were watching. There aren't any other pictures. I never did that again." J.H. told PC Smith that she did not know who she was talking to when she took this picture on blogtv.

     12. Shortly after the interview with J.H. was conducted, PC Smith viewed the pictures at the yfrog link with D.W.. PC Smith and D.W. confirmed that the pictures were of J.H. in a pink spaghetti strap top, or less, showing her breasts and genital areas. PC Smith observed that one picture showed J.H. fondling her vagina.

13. Detective Constable (DC) Jeremy Dann, a member of the cyber crimes unit for the London Police service, accessed the yfrog.com website that contained the photographs of J.H. and noted that the photographs appeared to be stills from an avi file that was 10 minutes and 13 seconds in duration. The avi file had been named "cassyslut.avi." DC Dann conducted a query of the yfrog account and found it to be a sub site of Imageshack, a popular internet site that provides file and image sharing services. DC Dann stated that he had activated a blogtv account in order to access J.H.'s "Iloveyoubaby1996" account. Despite J.H.'s earlier statement to PC Smith that she no longer had the password to her blogtv account, DC Dann was able to determine that the account had last been accessed on 01/09/2010. DC Dann noted that J.H. has a youtube channel titled "TheSexybabe96." DC Dann stated that the youtube profile has J.H.'s correct name, age, and address. The youtube videos show J.H. in the same distinct green chair as she had been sitting in when the nude photographs located on the yfrog.com website were made. DC Dann believes that J.H. willingly uploaded a short avi to blogtv or some other file sharing service, and that someone posted photographs made from this avi file to the yfrog.com website.

14. D.W. was notified of DC Dann's findings. D.W. told investigators that she was aware of the youtube account and admitted that J.H. had unsupervised access to the internet on a laptop in J.H.'s room. D.W. advised that she would be removing J.H.'s unsupervised access to the internet.

15. DC Dann sent an email to Imageshack support in an attempt to obtain the IP address of the party that uploaded the photographs to yfrog and with a request that the images be removed from viewing on yfrog. On 01/11/2010, Imageshack support replied

with the IP address, 74.36.163.43, as well as provided the date and time the upload took place, 01/08/2010 at 02:22:18 GMT. Imageshack also informed DC Dann that they had removed the yfrog.com photographs from view. DC Dann conducted a "WHOIS" search of IP address 74.36.163.43 using domain tools and found that this IP address was owned by the ISP Frontier Communications located at 180 South Clinton Avenue, Rochester, NY 14646. DC Dann reviewed the photos made from the avi file and concluded that J.H. exposed her breasts, as well as removed her underwear and possibly masturbated directly in front of the camera. DC Dann forwarded this information on to the Rochester Police Department in New York.

16. On 01/13/2010, DC Dann contacted D.W. with the updates on the case. D.W. advised that J.H. admitted her entire involvement with the blogtv blogcast and believes that J.H. will be cooperative with upcoming interviews.

17. On 01/22/2010, DC Alanna Hollywood interviewed J.H.. During the interview J.H. admitted that a few days before police involvement in this case, she had gone on her webcam while on MSN Messenger, an instant messenger device, and had displayed her breasts and vagina. J.H. stated that this was the first time she had exposed herself on webcam, and the video probably lasted approximately a half hour.

18. Following this investigation, the London Police Services advised the Royal Canadian Mounted Police (RCMP) National Child Exploitation Coordination Centre (NCECC) that images of a 13 year old female resident of London, Ontario, Canada, had been uploaded onto the yfrog.com website via an internet service provider located in Rochester, New York. The RCMP provided the ICE Attache in Ottawa, Canada, with an

investigative referral. In turn, the matter was referred to the ICE SAC in Buffalo, New York.

19. The ICE SAC in Buffalo, New York, subpoenaed Frontier Communications and was subsequently advised that the IP address used to upload the subject photographs was in service at the SUBJECT PREMISES.

20. The Attaché Ottawa sent a collateral to the RAC Springfield office and the case subsequently was assigned to SA Haferkamp. SA Haferkamp subpoenaed Frontier Communications requesting production of the name of the subscriber at IP address 74.36.163.43. On 4/28/2010 information was received from Frontier Communications revealing that, at the time the images were uploaded to yfrog.com from the SUBJECT PREMISES, the IP address was assigned to RON SEIVER.

A. Detailed below are the images of child pornography posted on yfrog.com by someone at the SUBJECT PREMISES, utilizing the SUSPECT COMPUTER / TARGET IP ADDRESS on 01/08/2010 at 02:22:18 (GMT), all of which I have reviewed:

i. Image one is taken from an avi file at the 36th second and is described as follows: J.H. is sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

ii. Image two is taken from an avi file at the 72nd second and is described as follows: J.H. is again sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

iii. Image three is taken from an avi file at the 108th second and is described as follows:  J.H. is again sitting in a green striped chair leaning back in the chair facing the camera with her hands up near her breast pulling her shirt down with her bra on.  J.H. appears to be wearing low cut pants or none at all.

iv. Image four is taken from an avi file at the 144th second and is described as follows: J.H. is again facing the camera wearing the same pink shirt, however, this time the shirt is pulled down exposing her stomach and her bra.  The image shows the lewd display of the breasts involving a child less than 18 years of age.

v. Image five is taken from an avi file at the 180th second and is described as follows: J.H. is sitting in a green striped chair facing the camera.  J.H. has the pink spaghetti strap shirt pulled down with bra pulled up exposing her breast.  The image shows the lewd display of the breasts involving a child less than 18 years of age.

vi. Image six is taken from an avi file at the 206th second and is described as follows: J.H. is sitting in a green striped chair with her head turned to the left with her hair covering her face.  J.H. is wearing a pink spaghetti strap shirt and blue jean type bottoms, and is leaning to the right of the chair.

vii. Image seven is taken from an avi file at the 252nd second and is described as follows: J.H. is again sitting in a green striped chair leaning

forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

 viii. Image eight is taken from an avi file at the 288th second and is described as follows: J.H. is standing in front of the green striped chair. J.H. is wearing the pink spaghetti strap shirt and is beginning to disrobe her blue jean bottoms partially exposing her vaginal area. The image shows the lewd display of the genital area of a child less than 18 years of age.

 ix. Image nine is taken from an avi file at the 324th second and is described as follows: J.H. is standing in front of the green striped chair leaning forward with her face directly in front of the camera. J.H.'s legs are exposed, and she appears to be shirtless with just her bra on.

 x. Image ten is taken from an avi file at the 360th second and is described as follows: J.H. is standing in front of the green striped chair leaning forward with her left hand resting on her chin looking to the left side of the camera. It appears that J.H. is not wearing a shirt.

 xi. Image eleven is taken from an avi file at the 396th second and is described as follows: J.H. is standing in front of the green striped chair leaning forward with her left hand resting on her chin looking straight into the camera. It appears that J.H. is not wearing a shirt or pants.

 xii. Image twelve is taken from an avi file at the 432nd second and is described as follows: J.H. is sitting in the green striped chair leaning back with her bottoms pulled off. J.H. has her legs open with her right

hand placed over her vaginal area with her fingers touching her vagina. The image shows the lewd display of the breasts and genital area of a child less than 18 years of age.

xiii. Image thirteen is taken from an avi file at the 468th second and is described as follows: J.H. is again sitting in the striped green chair wearing a pink spaghetti strap shirt. J.H. is not wearing any bottoms and is leaning forward as if she is using a computer mouse to control the computer.

xiv. Image fourteen is taken from an avi file at the 505th second and is described as follows: J.H. is sitting in the green striped chair leaning back with a pink spaghetti strap shirt on with her bottoms pulled off. J.H. has her legs open with her right hand placed over her vaginal area with her fingers touching or near her vagina. J.H.'s left hand is touching her chin and mouth. The image shows the lewd display of the genital area of a child less than 18 years of age.

xv. Image fifteen is taken from an avi file at the 541st second and is described as follows: J.H. is again sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

xvi. Image sixteen is taken from an avi file at the 577th second and is described as follows: J.H. is again sitting in a green striped chair leaning forward facing the camera. J.H. is wearing a pink spaghetti strap top with a low v neck.

## _Identification of the Subject Premises_

21. On or about 04/28/2010, in response to a subpoena issued by SA Haferkamp, Frontier Communications provided the subscriber information for IP Address 74.36.163.43 (the TARGET IP ADDRESS). Frontier Communications reported that the TARGET IP ADDRESS was registered to RON SEIVER, and that the service of this IP Address was physically being provided to 1042 US HWY 67, Roseville, Illinois 61473 (the SUBJECT PREMISES) at the times the same IP Address was used to make the posts set forth in paragraph 20A above.

22. On 04/28/2010 SA Haferkamp conducted a check in CLEAR for the SUBJECT PREMISES. CLEAR consolidates public records including addresses, driver's licenses, property deed transfers and corporate information. According to the CLEAR check, associated with the address are RON SEIVER, Brian Addis, and April Addis. In a query through a postal inspector it was also found that two other individuals may be residing at the SUBJECT PREMISES. The individuals are Jeanne G. Alexander and Douglas E. Alexander. Douglas E. Alexander is also named by Frontier communications as a subscriber at the SUBJECT PREMISES.

23. On 04/30/2010, ICE SA Haferkamp observed a vehicle with Illinois license plate 735 1738 in the parking area to the west side of the SUBJECT PREMISES. According to DMV records, the car is registered to the SUBJECT PREMISES by Jeanne G. Alexander and Douglas E. Alexander.

24. On 07/13/2010 SA Haferkamp made contact with Postal Inspector Larry Maxwell. Maxwell provided information confirming that RON SEIVER, April Addis, Brian Addis, Douglas Alexander, and Jeanne Alexander all are receiving mail delivered

at the SUBJECT PREMISES. Brian Addis is forwarding his mail to a PO Box from the SUBJECT PREMISES. Inspector Maxwell also indicated that the SUBJECT PREMISES is a single dwelling two story farm house.

25. On 07/14/2010 criminal history checks were run on all individuals mentioned in paragraph 22 above, with negative results.

26. On 07/16/2010 a subpoena was sent to Imageshack requesting information on who posted the images to yfrog for further verification. On 07/27/2010 Imageshack returned information regarding the upload of images to their yfrog site. Imageshack stated that the IP address 74.36.163.43 uploaded the images anonymously, meaning that the person who uploaded the file did not register prior to the upload. It is clear, however, that the images, though uploaded anonymously, were uploaded by someone at the SUBJECT PREMISES.

27. Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

A. Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

B. Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including electronic media,

photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

C. Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

D. Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

E. Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names,

addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

F. Collectors of child pornography prefer to have continuous access to their collection of child pornography.

### Computer Data

28. Based on my own experience and consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all related peripherals, to permit a thorough search later by qualified computer experts in a laboratory or other controlled environment:

A. Computer storage devices, such as hard disks, diskettes, tapes, laser disks, and Bernoulli drives, can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names. As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This review and sorting process can take weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

B. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast

array of computer hardware and software available requires even those who are computer experts to specialize in some systems and applications. It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

29. Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

A. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve

the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

B. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce.  Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

C. I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities.  I am not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA.  If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

## Conclusion

30. Based on the above information, there is probable cause to believe that 18 U.S.C. §§ 2252 and 2252A, which, among other things, make it a federal crime for any

person to knowingly possess and/or receive child pornography, has been violated, and

that the property, evidence, fruits and instrumentalities of these offenses, more fully

described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES. I

request the authority to seize such material. It is my assertion, based on previous

investigative experience, that evidence of the receipt and possession of child pornography

will be located on a computer or computers located at the SUBJECT PREMISES and that

this evidence can be forensically recovered from any computers used to commit the

offenses that are at the location to be searched. I am aware that evidence located on hard

drives is often recoverable months, and even years, after it has been placed on the hard

drive through the use of data recovery software utilized by computer forensic examiners.

31. Based on the foregoing, I respectfully submit that there is probable cause to seize evidence of violations of 18 U.S.C. Section 2252A(a)(2), Receipt or Distribution of Child Pornography, and 18 U.S.C. Section 2252A(a)(5)(B), Possession of Child Pornography, found at the SUBJECT PREMISES. I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

Dwayne E. Haferkamp
Special Agent,
Department of Homeland Security
U.S. Immigration and Customs Enforcement
Office of Investigations

Subscribed and sworn
before me this ___16___ day of ___August___, 2010

HONORABLE THOMAS J. SHIELDS
UNITED STATES MAGISTRATE JUDGE